



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed April 7, 2022**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Intelligent Surveillance** | § | **Case No. 21-31096-sgj-7** |
| **Corporation,** | § | |
| | § | |
| **Alleged Debtor.** | § | **Involuntary Chapter 7** |
| | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER FOR RELIEF
ENTERED AFTER TRIAL ON CONTESTED INVOLUNTARY PETITION**

Abacus Technologies, Inc. ("**Abacus**"), along with three of ISC's other creditors, filed an involuntary petition against Intelligent Surveillance Corporation ("**Alleged Debtor**" or "**ISC**") on June 11, 2021 (the "**Petition Date**").[1] ISC contested the petition, first by filing a motion to dismiss under Rules 1011 & 7012 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"),[2] and then, following the Court's denial of that motion, with the filing of an Answer.[3]

---

[1] ECF No. 1.
[2] ECF Nos. 10-12.
[3] ECF No. 129.

After considering: (i) the briefs submitted by Abacus and ISC;[4] (ii) the record developed in the case since the Petition Date; and (iii) the documentary and testimonial evidence and argument of counsel at the full-day evidentiary hearing held on March 30, 2022 (the "**Hearing**"), the Court entered enter the order for relief on April 4, 2022 in accordance with Bankruptcy Code § 303(h).[5] This constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014.

## I.    FINDINGS OF FACT

### A.    *Pre-petition factual background*

#### 1.    Alleged Debtor ISC

1.    ISC is a Texas corporation formed on January 1, 2018 with its principal place of business in Forney, Texas. ISC manufactures security cameras for use by federal and state law enforcement and first responders.[6] For much of its short history, ISC's sole source of sales revenue has come from a contract with the United States Customs and Border Patrol.[7] From its inception, ISC has been undercapitalized, relying on repeated infusions of capital in the form of short-term and long-term loans and sales of equity to individual investors.[8]

#### 2.    The Original Petitioning Creditors

2.    In June 2019, Abacus and ISC engaged in discussions regarding ISC's need to order parts from Abacus to manufacture surveillance cameras to service a contract ISC had with U.S. Customs and Border Patrol. Beginning September 27, 2019 and through December 27, 2019, ISC issued five purchase orders for $1,760,071.50 to Abacus. Between January 23, 2020 and

---

[4] ECF Nos. 165 & 166, respectively.
[5] ECF No. 170.
[6] ECF No. 11.
[7] ISC A/R Aging Summaries, Ex. ATI-8. References to exhibits in these Findings of Fact and Conclusions of Law are to exhibits admitted into evidence at the Hearing.
[8] Subscription Agreements, Ex. ATI-18, & ISC General Ledger, Ex. ATI-20.

March 2, 2020, Abacus shipped to and invoiced ISC for $327,860.54 of the products ordered.[9] After more than a year of seeking payment on its invoices, Abacus filed suit against ISC in Texas state court. At a deposition in connection with that case, ISC's CEO David Buschhorn acknowledged that there was no dispute with respect to approximately $107,000.00 of Abacus's claim. In provisionally denying ISC's Motion to Dismiss, the Court pointed to this testimony in support of its finding that, at least with respect to that portion of Abacus's claim against ISC, there was no bona fide dispute as to liability or amount. Accordingly, Abacus had standing to serve as a petitioning creditor under Bankruptcy Code § 303(b).[10]

3.      IMS and the Alleged Debtor began discussions regarding a possible business relationship in August 2019. Between September and November 2019, ISC issued three purchase orders to IMS requiring IMS to manufacture a total of 8,400 separate camera parts forming 2100 complete security camera housings. The purchase orders totaled $176,295.00 on "Net 30 Days" payment terms. After delivery, IMS sent ISC four separate invoices totaling $176,295.00. IMS paid only one of the invoices, for $50,370.00, leaving an unpaid balance of $125,925.00. IMS made numerous demands for payment, but ISC refused to pay the balance due, ultimately claiming the delivered products were defective.[11]

4.      ISC engaged Brace to manufacture and deliver security camera housings. ISC submitted two purchase orders to Brace for product totaling $28,544,930. From May through September 2019, Brace manufactured and delivered certain of the requested items. ISC paid two invoices submitted by Brace but did not pay six other invoices totaling $653,441.94.[12]

---

[9] ECF No. 17.
[10] ECF Nos. 49 & 52.
[11] In the order provisionally denying the Motion to Dismiss, the Court found that IMS's claim was subject to a bona fide dispute as to liability or amount. ECF Nos. 49 & 52.
[12] In the order provisionally denying the Motion to Dismiss, the Court found that Brace's claim was subject to a bona fide dispute as to liability or amount. ECF Nos. 49 & 52.

5.      Brace sub-contracted with OPS, which manufactured 450 housing units and sent an invoice for $26,100.00 to ISC for them. Despite agreeing to pay for the housing units and receiving an invoice for same, ISC failed to pay for the completed products. On March 19, 2021, OPS filed a complaint in the Superior Court of New Jersey against ISC, and three of its employees, asserting claims for breach of contract, breach of good faith and fair dealing, common law fraud, and consumer fraud. ISC claimed it never consented to Brace's use of OPS as a sub-contractor.[13]

6.      To avoid a "race to the courthouse," (which was partly already underway), Abacus, Brace, OPS, and IMS (the "**Original Petitioning Creditors**") filed the involuntary petition to take advantage of the automatic stay and to bring all claims on the Alleged Debtor's assets into a single forum for resolution in a fair, orderly, uniform process governed by the Bankruptcy Code.

### B.      Post-petition procedural background

7.      On June 11, 2021, four of ISC's creditors, including Abacus, signed and filed an involuntary Chapter 7 petition initiating the above-captioned case.[14]

8.      On July 6, 2021, ISC filed its Motion to Dismiss, alleging that: (i) the Original Petitioning Creditors lacked standing because each of their claims was either contingent or subject to a bona fide dispute as to liability or amount; and (ii) the petitioning creditors knew they lacked standing, so on that basis alone the petition was filed in "bad faith."[15]

9.      On July 27, 2021, the Court held a status conference, after which the Court set a hearing for September 15, 2021 on the Motion to Dismiss "to determine the standing of the

---

[13] In the order provisionally denying the Motion to Dismiss, the Court found that OPS's claim was subject to a bona fide dispute as to liability or amount. ECF Nos. 49 & 52.
[14] ECF No. 1.
[15] ECF Nos. 10-12.

Petitioning Creditors only."[16] The Court also directed ISC to "file a sworn declaration attesting to the fact that the Alleged Debtor has more than 12 creditors . . . no later than August 5, 2021."[17]

10.      On August 17, 2021, the Alleged Debtor filed under seal with the Court a sworn declaration by ISC's President, David Buschhorn, in which he attested to the accuracy of the list of ISC's creditors that held claims against ISC as of the Petition Date.[18] The list, attached as Exhibit A-1 to the declaration (the "**First ISC Creditor List**"), included 28 creditors, 6 of which were identified as having "disputed" claims, with the remaining creditors identified as "actual creditors" whose claims the Alleged Debtor did not identify as subject to bona fide dispute as to liability or amount. According to Mr. Buschhorn's declaration, "[a]s of June 11, 2021, the date on which the involuntary petition was filed in this matter, ISC had 23 actual creditors with 5 additional vendors/suppliers that have asserted claims but that ISC disputes as to validity or amount."[19]

11.      On September 15, 2021, the Court held a full-day evidentiary hearing on the Motion to Dismiss, addressing only the issue of the standing of the Original Petitioning Creditors, and on September 24, 2021, the Court entered the order provisionally denying the Motion to Dismiss, finding that of the four Original Petitioning Creditors only Abacus had standing to pursue the petition, as at least $107,000.00 of its claim was not subject to a bona fide dispute.[20] That order provided for the First ISC Creditor List to be unsealed and also provided that "the Hearing on the Motion to Dismiss is continued to a date and time to be determined, pending discovery as to whether the Alleged Debtor has 12 or more creditors and, if the Alleged Debtor has 12 or more

---

[16] ECF No. 19.
[17] *Id.*
[18] ECF No. 30.
[19] Although Mr. Buschhorn attested that ISC had *5 disputed* and *23 undisputed* creditors, the actual exhibit filed with the declaration identified *6 disputed* and *22 undisputed creditors*. The four Original Petitioning Creditors were identified by ISC as holding claims subject to dispute as to liability and amount.
[20] ECF No. 52.

creditors, to provide a reasonable opportunity for other creditors to join the Involuntary Petition (as provided under Bankruptcy Code § 303(c) and Bankruptcy Rule 1003(b)).ʺ[21]

12.     On October 7, 2021, three of the creditors ISC identified as holders of undisputed claims on the First ISC Creditor List (Factory Outlet Tooling, PM Industrial Supply, and Grad Conn, Ltd., collectively, the "**Joining Creditors**") joined in the involuntary petition.[22]

13.     On October 15, 2021, the Court entered an order setting a hearing "to hear and determine, if necessary: (i) the standing of the petitioners who have joined or may join the involuntary petition; and (ii) the number of holders of claims against the Alleged Debtor as of the petition date that qualify to be petitioning creditors under § 303 of the Bankruptcy Code."[23] ISC subsequently filed a motion to strike the Joinder, which the Court also set for hearing on December 6, 2021.[24]

14.     At that hearing, the parties stipulated that of the 22 creditors on the First ISC Creditor List that ISC had identified as holding undisputed claims, 19 had received post-petition payments from ISC on account of pre-petition debts, including all three of the Joining Creditors. Following that evidentiary hearing, the Court entered orders denying ISC's Motion to Dismiss,[25] its motion to strike the Joinder,[26] and its motion to compel discovery responses from the petitioning creditors.[27] In the order denying the Motion to Dismiss, the Court found that ISC had fewer than 12 creditors eligible to be counted for numerosity purposes under Bankruptcy Code § 303(b).[28] Accordingly, even if Abacus were the only petitioning creditor, dismissal on standing grounds

---

[21] *Id.* at 3.
[22] ECF No. 56 (the "**Joinder**").
[23] ECF No. 58.
[24] ECF No. 60.
[25] ECF No. 118.
[26] ECF No. 121.
[27] ECF No. 120.
[28] ECF No. 118.

would not be appropriate, as Abacus had standing, and only one creditor with standing was required under the Bankruptcy Code because ISC has fewer than 12 creditors. At the same time, however, even if ISC had more than 12 creditors that qualified to be counted for numerosity purposes under Bankruptcy Code § 303(b), the three Joining Creditors also had standing to join the petition because their claims were neither contingent nor subject to a bona fide dispute as to liability or amount as of the Petition Date.[29] Finally, the Court denied the requests of two of the Joining Creditors to withdraw from the petition.[30]

15.     On December 30, 2021, ISC filed an *Answer, Defenses, and Request for Relief*[31] opposing entry of the order for relief. In its Answer, ISC asserted seven affirmative defenses to the involuntary petition, namely that: (i) the Original Petitioning Creditors lack standing; (ii) the Joining Creditors lack standing (iii) that ISC had more than 12 creditors for numerosity purposes; (iv) the joinder of the Joining Creditors was done in bad faith; (v) the petition was filed in bad faith; (vi) the Court should abstain; and (vii) ISC was generally paying its debts as they come due.

16.     The first four of these defenses the Court has already ruled upon in its orders denying the Motion to Dismiss and order denying the motion to strike the Joinder.[32] Regarding the fifth defense—that the involuntary petition was filed in bad faith—the Court finds that the evidentiary record does not support a finding of bad faith on the part of any of the Original Petitioning Creditors or the Joining Creditors. Abacus and its fellow petitioners had good cause to initiate the involuntary petition against ISC based on ISC's failure to generally pay its debts as

---

[29] *Id.*
[30] *Id.*
[31] ECF No. 129 (the "**Answer**").
[32] ECF Nos. 52, 118, & 121.

they came due as of the Petition Date.[33] With respect to the sixth defense asserted by ISC in its Answer, the Court notes that ISC's motion to abstain is currently pending but has not been set for hearing.[34] The Court will address ISC's abstention motion in a separate order.

17.      ISC filed an amended list of creditors with its Answer, alleging for the first time that it actually had 60 creditors as of the Petition Date, with claims in an aggregate amount impossible to calculate from the data included on the list.[35] Included among the newly identified creditors were ISC's legal counsel, with a $7,730.00 claim against the Alleged Debtor; ISC's Vice President of Operations Galen Green, who apparently was owed $180,995.00; and a number of creditors to whom ISC apparently owed small, recurring debts.[36]

18.      In February 2022, in response to Abacus's interrogatories, ISC produced another amended list of creditors, this time asserting that it had 91 creditors as of the Petition Date (the "**Second Amended ISC Creditor List**").[37] With so many creditors, there is no question that this is more than a "two-party" dispute. In the Second Amended ISC Creditor List, ISC included the claims of thirteen employees that were owed salary as of the Petition Date because the company had been unable to make payroll for all its employees in the weeks leading up to the filing of the petition.[38] The uncontroverted testimony at the Hearing was that all of ISC's employees, except for Mr. Green but including Mr. Buschhorn, were paid in full post-petition on account of their pre-petition deferred salary claims.

---

[33] Because the Court finds that the evidence does not support a finding of bad faith on the part of the petitioning creditors, the Court need not determine whether, as a matter of law, a finding of "bad faith" can be made in the absence of a denial of entry of an order for relief.

[34] ECF No. 158.

[35] ECF No. 129-1 (the "**First Amended ISC Creditor List**").

[36] *Id.*

[37] ISC's Lists of Creditors, Ex. ATI-2; ISC's Responses and Objections to Abacus's Interrogatories, Ex. ATI-17.

[38] *Id.*

C. *Evidence regarding whether ISC was generally not paying its debts as they came due as of the Petition Date*

19. As of the Petition Date, 31 out of ISC's 34 trade creditors had past-due debts totaling $709,413.57, representing 91% of ISC's trade creditors by number and 96.6% of its outstanding accounts payable.[39] Of that amount, 90% was over 90 days past due. With respect to the amounts the alleged debtor acknowledges were owed to the first 22 creditors identified on the ISC Creditor Lists as holding undisputed debts as of the Petition Date, the average invoice was over 420 days past due, half of ISC's outstanding invoices were at least 496 days past due, and 99% of the invoices relating to the debts on the ISC Creditor Lists for these creditors were past due as of the Petition Date.[40]

20. At the end of May 2021, ISC's main bank account was overdrawn by $34,023.84,[41] many of its employees were "deferring" their paychecks because the company had insufficient funds on hand to pay them,[42] and some of the company's personnel were providing the alleged debtor with cash infusions in the form of undocumented "loans."[43] The week before the Petition Date, ISC was in the process of laying off employees.[44] The company was also a defendant in at least eight lawsuits by creditors seeking payment of debts.[45]

21. ISC's financial straits as of the Petition Date were not a recent phenomenon; indeed, the percentage of accounts payable amounts that were past due never fell below 50% between

---

[39] ISC's Aging A/P Summaries, Ex. ATI-1, at ISC_001878.
[40] Summary Chart of ISC Undisputed Debts as of Petition Date, attached to Abacus's trial brief as Attachment 1, ECF No. 165.
[41] ISC's Bank Statements, Ex. ATI-3, at ISC_004054.
[42] Ex. ATI-2; ISC's Transaction Report: Payroll, Ex. ATI-9, at ISC_012768; Ex. ATI-20.
[43] ISC's Transaction Report: Personal Loans by David Buschhorn, Ex. ATI-10, at ISC_001979; ISC's General Ledger, Ex. ATI-20.
[44] Email from Peter Padua to Bryan Mikesh dated June 3, 2021, Ex. ATI-12-1, at ISC_001817.
[45] Ex. ATI-17.

January 1, 2020 and the Petition Date.[46] From its inception in 2018, ISC appeared to be undercapitalized and, as a consequence, resorted to unusual financial practices. The company borrowed money it could not pay back on onerous terms.[47] ISC used an employee's personal credit cards to pay ongoing business expenses and interest on the personal expenses of the company's principals.[48] From that same employee, Galen Green, the company repeatedly borrowed money to fund operations—much of which it never paid back. Between 2018 and the Petition Date, Mr. Green provided the company over $200,000 in the form of undocumented loans and liberal use of his personal credit cards.[49] As of the Petition Date, Mr. Green had not been reimbursed for the vast majority of these infusions of personal cash and credit into the company's coffers.[50]

22.     As of the Petition Date, ISC was late on dozens of debts.[51] Moreover, the amount of past-due debt was substantial, and much of it was owed to ISC's trade vendors that Mr. Buschhorn in his testimony at the December 6, 2021 hearing deemed "critical."[52] The few debts ISC was paying on time were *de minimis* amounts to monthly utilities and the like that were so insignificant ISC did not even include them on the list of creditors initially submitted to the Court in August 2021.[53] The evidence adduced at trial confirmed that ISC paid many of these using Mr.

---

[46] Summary Chart of Past-Due Accounts Payable, attached to Abacus's trial brief as Attachment 2, ECF No. 165.
[47] *E.g.*, Ex. ATI-20, at line no. 18721; Ex. ATI-13-25.
[48] Ex. ATI-3; ISC's Transaction Report: Galen Green Debt, Ex. ATI-19.
[49] Ex. ATI-19.
[50] Ex. ATI-2; Ex. ATI-19; Summary of Galen Green's Loans, attached to Abacus's trial brief as Attachment 6, ECF No. 165. Mr. Green testified at the Hearing that since the Petition Date, he has been paid back only **$10,000.00** for the truck he sold the company in January 2019, while all the other employees, including the Buschhorns, have been paid 100% of their claims identified on ISC's Second Amended Creditor List.
[51] Ex. ATI-1.
[52] Hr'g Tr., Dec. 6, 2021, at 26:8; 87:6; 87:15; 92:20-21; 94:4.
[53] Ex. ATI-2. Many of these creditors were not paid with funds on hand but instead by credit cards in Galen Green's or his wife's name that carried high balances throughout the two-year period preceding the Petition Date. ISC's Credit Card Statements, Ex. ATI-4.

Green's credit cards. Thus, the great majority of ISC's creditors were not being paid in accordance with the payment terms ISC had negotiated with them.

23. ISC's financial condition as of the Petition Date was not a short-term anomaly. ISC had been funding its operations in part by carrying large balances on Mr. Green's personal credit cards going back to the company's inception.[54] And in addition to those identified on the ISC Creditor Lists and A/P Aging Summary with past-due debts owing as of June 11, 2021, during the 18 months before the Petition Date numerous other creditors had debts come due that ISC failed to pay in a timely manner.[55] A number of these creditors received substantial payments on their debts in the 90 days before the bankruptcy filing, as ISC chose which creditors to pay and which to leave in the lurch. For example, as of March 13, 2021, ISC owed Hanson Productions $224,851.00, of which $187,375.84 was more than 90 days past due.[56] But as of the Petition Date, ISC owed Hanson just $500.00 (which was past due).[57] TVC Communications was owed $53,147.29 that was overdue by more than 90 days as of March 13, 2021, but was owed only $33,147.29 on the Petition Date.[58] Earle M. Jorgensen was owed $33,858.10 on a debt that was over 90 days past due as of March 13, 2021 but was only owed $858.10 as of the Petition Date. Many other creditors were paid by Mr. Green's credit card in the 90 days before bankruptcy.[59] Moreover, ISC was indisputably late in making payments to multiple creditors in 2019, including

---

[54] Ex. ATI-19; Ex. ATI-4 (for two-year period before the Petition Date).
[55] Ex. ATI-14.
[56] Ex. ATI-1, at ISC_001901; *see also* ATI-12-62.
[57] Ex. ATI-1, at ISC_001878.
[58] Ex. ATI-1, at ISC_001901 & ISC_001878.
[59] Ex. ATI-4. "Courts treat credit card payments used to pay creditors as avoidable preferences pursuant to 11 U.S.C. § 547(b)." *In re Smith*, 415 B.R. at 236.

at least the following: System Barcode; IMS; Teknique; Imagineering; Protolabs; DHL Express; Uline; Touchstone3D; and TVC Communications.[60]

24.     In addition to falling far behind on payments to trade creditors and remaining in that condition for 18 months before bankruptcy (as reflected on ISC's A/P Aging Summaries), ISC also had trouble paying its expenses in the ordinary course of its business. For example, ISC was assessed substantial amounts in bank fees for overdrafts, low balances, insufficient funds, and the like.[61] During the two years before bankruptcy, ISC incurred thousands of dollars in credit-card interest and fees on Mr. Green's credit cards, carrying balances that averaged just shy of $34,000.00 per month combined for the three cards.[62] ISC often made only minimal payments to avoid fees and free up room for new charges.[63] ISC also had trouble paying its rent on time, and in July 2020 received a default notice from its landlord for non-payment.[64] Payroll was also a problem, and not just in the month before the Petition Date. As early as February 2020, David Buschhorn had to lend the company $30,000 for ISC to make payroll.[65] Mr. Green also loaned the company $12,500 to cover payroll in September 2020, for which he apparently had not been paid back as of the Petition Date.[66]

---

[60] Ex. ATI-12-7, at ISC_009354; Ex. ATI-13-24, at ISC_009444; Ex. ATI-14-9, at ISC_011348; Ex. ATI 12-5, at ISC_001042; Ex. ATI 12-18, at ISC_009282; Ex. ATI-1, at ISC_001890, ISC_001888, ISC_001892; ISC_001894; ISC_001898.

[61] In 2019, ISC reported that it spent $5,158.00 on bank fees. *See* ISC's Tax Returns, Ex. ATI-5, at ISC_001963; *see also* Summary of ISC Bank Overdraft Fees, attached to Abacus's trial brief as Attachment 5, ECF No. 165.

[62] ISC Credit Card Balance Summary, attached to Abacus's trial brief as Attachment 3, ECF No. 165; Ex. ATI-4.

[63] Ex. ATI-4.

[64] Ex. ATI-12-29, at ISC_004499. The landlord assessed late fees for the months of June, July, August, and September 2020.

[65] Ex. ATI-10, at ISC_001979. Other than the entries in the general ledger and the Transaction Report derived therefrom, ISC has produced no documentation concerning the terms of this or any other loan by David Buschhorn to ISC. The bank statements show deposits made around the time of the alleged loans, but no documentation as to the source of funds for those deposits was produced.

[66] *See* Summary of Galen Green's Loans to ISC, attached to Abacus's trial brief as Attachment 6, ECF No. 165.

25.     ISC's corporate tax return shows a loss of almost $3.4 million in 2019, having sold only $177,428.00 in goods for the year.[67] Despite these lackluster sales, the company paid its officers a combined $652,000.00 in 2019, including $321,000.00 to David Buschhorn.[68] That same year, the company also spent over $100,000.00 on travel and almost $20,000.00 on meals, all while carrying high credit-card balances, paying exorbitant interest on short-term loans, and borrowing money from Mr. Green.[69]

26.     The number and amount of unpaid debts as of the Petition Date has been something of a moving target.[70] On the First ISC List of Creditors, verified by Mr. Buschhorn, ISC claimed to have a total of 28 creditors, 22 of which ISC indicated had undisputed claims in an amount totaling $564,085.60.[71] Although the First ISC Creditor List itself does not indicate the extent to which the amounts listed for each creditor were past due as of the Petition Date, the purchase orders, invoices, account statements, and creditor correspondence that produced in response to discovery requests establish that the overwhelming majority of debt reflected on the First ISC Creditor List was long past due as of the Petition Date.[72]

27.     The numbers on the A/P Aging Summaries provide abundant evidence to support a finding that ISC was not generally paying its debts as they came due as of the Petition Date (and, indeed, for a substantial period before that).[73] ISC's A/P Aging Summary as of June 11, 2021

---

[67] Ex. ATI-5, at ISC_001958. The 2019 tax return also shows a carryover of a $1,143,829 loss from 2018. *Id.* at ISC_001963.

[68] *Id.* at ISC_001960.

[69] *Id.* at ISC_001963; Ex. ATI-4; Ex. ATI-20, at line nos. 18721 & 18741.

[70] For example, ISC objected to, and outright refused to answer, numerous interrogatories seeking firm answers to questions about how many creditors ISC had and the amount of debt ISC owed them as of the Petition Date. Ex. ATI-17.

[71] ECF No. 30-1.

[72] Summary Chart of ISC Undisputed Debts as of Petition Debt, attached to Abacus's trial brief as Attachment 1, ECF No. 165; Exs. ATI-12, ATI-13, & ATI-14.

[73] Summary Chart of ISC Undisputed Debts as of Petition Debt, attached to Abacus's trial brief as Attachment 1, ECF No. 165; Summary Chart of Past-Due Accounts Payable, attached to Abacus's trial brief as Attachment 2, ECF No. 165.

shows $734,155.85 owing on accounts payable, with $709,413.57 of that amount being past due as of the Petition Date.[74] Of that amount, $657,650.46 was over 90 days past due (90% of the total past-due amount was more than 90 days past due).[75]

### D.  Evidence concerning ISC's overall conduct of its financial affairs

28.  Some facts that demonstrate ISC's poor financial management include:

- As of May 28, 2021 (15 days before the Petition Date), the balance in ISC's primary business checking account was **negative $34,023.84**.[76] ISC's other bank accounts were also at or near zero balances at the end of May 2021.[77]

- ISC had failed to make payroll for at least 13 employees in May and June 2021, who were owed the collective amount of **$76,886.24** as of the Petition Date.[78]

- As of the Petition Date, ISC owed **$49,198.86** on the three personal credit cards of Mr. Green used primarily for business, and an unknown amount on the several other credit cards for which ISC did not produce statements.[79] Over the two years before the Petition Date, ISC's total monthly balance carried on those three cards averaged **$33,958.49**.[80]

- Both Galen Green and David Buschhorn made a number of loans to the company from their personal funds, none of which had any apparent payment schedule. For example, on February 18, 2020 Mr. Buschhorn made a "Temporary Loan for Payroll & Other Expenses" in the amount of **$30,000.00,** and then paid himself back in full by March 30, 2020.[81] On May 27, 2021, Mr. Buschhorn made another **$25,000.00** undocumented loan.[82] On the Petition Date, ISC made a **$4,000.00** payment to David Buschhorn, allegedly on account of that loan, even as dozens of creditors, some with unpaid debts that were over 500 days past due, remained unpaid.[83] In October 2021, again while creditors with undisputed pre-petition debts remained unpaid, ISC made another post-petition payment in the amount of **$21,000.00** to David Buschhorn on account of the pre-petition undocumented loans.[84] Although there is evidence that

---

[74] Ex. ATI-1, at ISC_001878.

[75] *Id.*.

[76] Ex. ATI-3, at ISC_004054.

[77] Ex. ATI-3.

[78] Ex. ATI-2; Ex. ATI-9, at ISC_012768.

[79] Ex. ATI-2.

[80] Ex. ATI-4; Summary of ISC Credit Card Balances, attached to Abacus's trial brief as Attachment 6, ECF No. 165.

[81] Ex. ATI-10, at ISC_001979.

[82] *Id.*

[83] Although ISC asserts on its Second Amended List of Creditors that Mr. Buschhorn was owed $48,384.60 as of the Petition Date, that amount does not reflect the $4,000 he paid himself on the Petition Date. Ex. ATI-20, at line no. 10386.

[84] Ex. ATI-10, at ISC_001979.

funds in the amounts of the loans claimed were deposited into ISC's bank accounts,[85] ISC produced no documentation establishing that the funds did, indeed, come from Mr. Buschhorn and Mr. Green.

- Mr. Buschhorn claims to have "sold" to the company on six occasions personal award miles and travel upgrades that he allegedly used for company business—at a cost to the company of **$27,048.37**. For example, on December 4, 2019 he charged the company **$6,000.00** to "Reimburse Personal Miles Used for Business When Things Were Tight."[86] ISC produced no documents that could establish how Mr. Buschhorn arrived at the value for the "award miles" and "upgrades" he sold to the company.

- In addition to the preferential payments made to creditors in the 90 days before the Petition Date, ISC also appears to have made a number of preferential payments to insiders during the year before bankruptcy as well as potentially fraudulent transfers in the two years before the Petition Date. Such potentially avoidable transfers include the aforementioned sales of award miles, payments on "deferred" compensation, and other personal expenditures paid for by ISC while the alleged debtor was delaying or hindering creditors seeking payment on their overdue accounts.

- ISC paid only those debts it wanted to pay, not because it could not have made payments towards its many overdue debts, but apparently because ISC's management did not make paying all of its creditors a priority. If ISC purchased a product from a supplier it did not think it would need again, ISC would simply ignore creditor demands for payment, even if it was a relatively small amount. For example, ISC bought and used product from Safety-Kleen but chose not to pay the bill when it came due—or for many months thereafter. Said one ISC employee blithely: "I'm never going to use them again so I am not worried about it."[87]

- Between July 2019 and June 11, 2021, ISC **deposited more than $10 million into its bank accounts**, but still did not use that money to pay many of its creditors with long-overdue payments due to them.[88] During that same time period, Stephanie and David Buschhorn paid themselves **$899,705.21**,[89] and ISC continued to spend money on expensive meals, travel, political action committee contributions, personal-fitness fees, interest on Galen Green's credit cards, and preferential payments to creditors that ISC's management deemed worthy of payment at the expense of those they chose to ignore.

- ISC included three credit cards with high balances on its Second Amended Creditor List but produced no documents showing that the amounts listed for them are obligations of ISC (i.e., that any of the credit cards listed as creditors could seek to enforce payment obligations from ISC). Indeed, Mr. Green acknowledged at the

---

[85] Ex. ATI-3.

[86] Ex. ATI-20, at line nos. 6859, 6878, 6931, 6932, 6933, & 11864.

[87] Ex. 12-12, at ISC_000447.

[88] Ex. ATI-3; Summary Chart of ISC Bank Deposits, attached to Abacus's trial brief as Attachment 4, ECF No. 165.

[89] Ex. ATI-9, at ISC_012764-65 & ISC_012767.

Hearing that all the credit cards are in his name. ISC also incurred substantial business-related expenses on several other credit cards belonging to Mr. Green.[90]

- In the year before the petition, trade creditors filed eight separate lawsuits against ISC.[91] This shows that ISC's issue was not just with a single creditor but many.

29.    The documents ISC produced reveal a number of red flags and questions. Most notable are the company's accounting irregularities. ISC's books and records are kept almost entirely by one man, Galen Green, who has no background in accounting. ISC's books have never been audited. ISC's general ledger contains many inconsistencies and questionable entries, including numerous inexplicable "adjustments" the company made to the books.[92]

30.    Although ISC argued that the coronavirus pandemic caused disruptions to its business and that these "general force majeure considerations" caused ISC to enter "agreements with the creditors that made the debts not due,"[93] a substantial number and amount of debts were incurred and came due before the pandemic disrupted business in the United States.[94]

31.    Both pre- and post-petition, ISC made payments to certain creditors on account of pre-petition debts that are potentially avoidable and recoverable under Bankruptcy Code §§ 547 & 549. At the December 6, 2021 hearing, Mr. Buschhorn testified that ISC had made post-petition payments to at least 20 of its creditors on account of pre-petition debts.[95] Evidence admitted at the March 30, 2022 Hearing confirms that ISC also made numerous pre-petition payments to creditors on antecedent debts in the 90 days before the Petition Date.[96] The Alleged

---

[90] Ex. ATI-19.

[91] Ex. ATI-17.

[92] Ex. ATI-20.

[93] ECF No. 129, at 10. ISC did not produce any agreements with creditors providing that any of the debts identified on ISC's A/P Aging Summaries or the ISC Creditor Lists had not come due according to the terms and conditions on which they were originally incurred.

[94] Ex. ATI-1, at ISC_001822 (showing $676,086.49 in past-due payables on total accounts payable of $1,113,930.79 (i.e., over 60% in amount were past-due)).

[95] ECF No. 118.

[96] Exs. ATI-1, ATI-2, ATI-3. A close reading of these exhibits reveals that ISC engaged in at least $600,000 of potentially avoidable pre-petition and post-petition transfers on account of past-due pre-petition debts.

Debtor neither sought nor obtained Court approval for any of the post-petition payments made to creditors on account of pre-petition debts.

32.    ISC went from 28 employees in April 2020 to 11 as of March 30, 2022. Both Mr. Buschhorn and Mr. Green testified that ISC had only about $7,000.00 cash in hand as of the date of the Hearing and would need to borrow money (presumably from Mr. Buschhorn) to meet its April 1, 2022 payroll obligations.

33.    Post-petition, ISC appears also to have engaged in at least one sizeable and highly questionable transaction, in which ISC wired $1.1 million of funds to an entity formed at the direction of Mr. Buschhorn that is controlled by Mrs. Buschhorn's father-in-law.[97]

## II.    CONCLUSIONS OF LAW

### A.    *Courts employ a four-factor test to determine if a debtor was not generally paying its debts as they came due on the Petition Date.*

34.    The Court has subject matter jurisdiction over this contested matter under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. §§157(b)(2)(A) & (O) over which the Court can enter a final order under the standing order of reference (Misc. Rule No. 33) for the Northern District of Texas dated August 3, 1984. The statutory basis for entry of the order for relief is 11 U.S.C. § 303. Venue is proper in this district under 28 U.S.C. 1409.

35.    Entry of an order for relief on an involuntary bankruptcy petition is mandatory if the requisite number of petitioning creditors with standing prove by a preponderance of the evidence that an alleged debtor was not paying its debts as they came due as of the petition date.[98]

---

[97] Little is known about the details of this transaction because ISC did not produce any documents concerning it.

[98] 11 U.S.C. § 303(h). The Court has already determined that there are a sufficient number of petitioning creditors with standing to pursue the involuntary petition. ECF Nos. 49, 52, & 118.

36.     The Court, like many others, uses a four-factor test to determine whether an alleged debtor in an involuntary case was not paying its debts as they came due. Those four factors are "(i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs. No one factor is more meritorious than another; what is most relevant depends on the facts of each case."[99]

37.     As the Court explained in *Acis*, "[c]ourts typically hold that 'generally not paying debts' includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation."[100] "Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due."[101]

38.     The determination is made as of the petition date.[102] Payments made to creditors post-petition do not factor in to the analysis and "may not be considered by the Court."[103] It is not a "balance-sheet insolvency" test.[104] Only payment obligations that have come due are considered in the analysis. Regarding the number of past-due debts, even a single debt not timely paid can support a finding that the alleged debtor was not paying debts as they came due if it represents a substantial debt relative to the debtor's overall financial circumstances.[105] Though not an inflexible

---

[99] *In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 143 (Bankr. N.D. Tex. 2018) (citing *In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000); *In re Bates,* 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016)).

[100] *Id.* (citing *In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).

[101] *Id.* at 143–44.

[102] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993); *In re Agrawal*, 562 B.R. 510, 514 (Bankr. W.D. Okla. 2016) ("It is fundamental that the determination of whether the debtor is generally paying such debts as they come due must be made as of the date of the filing of the petition.").

[103] *In re Edwards*, 501 B.R. 666, 682 (Bankr. N.D. Tex. 2013) (Houser, J.) (citing *In re Norris*, 114 F.3d 1182 (5th Cir. 1997)).

[104] *In re Bates*, 545 B.R. 183, 186-87 (Bankr. W.D. Tex. 2016).

[105] *See, e.g.*, *In re Smith*, 415 B.R. 222, 232 (Bankr. N.D. Tex. 2009) (Hale, J.) ("Thus, the alleged debtor may not be 'generally' paying his debts as they come due when he is not paying one hundred percent of his debts to only one creditor, or paying most of his debts in number to small recurring creditors, but is not paying a few creditors that make up the bulk of his debts."); *In re Mikkelson*, 499 B.R. 683, 693 n.13 (collecting cases).

or purely mathematical test, some courts have found the 50% threshold significant. That is, if 50% in amount of an alleged debtor's debts are past due as of the petition date, these courts have found that such debtors were not paying their debts as they came due.[106]

39.      With respect to the materiality of a debtor's non-payment of debts, included in the examination is whether the alleged debtor preferred some creditors over others in the time leading up to the petition date. For example, in one case a bankruptcy court found it relevant that the alleged debtor had "elected to pay some debts, including debts incurred on new vehicles and jewelry, while neglecting to pay multiple final judgments rendered against him."[107] The Court in the past has found it significant where an alleged debtor "has paid those creditors whose claims she wants to pay, rather than all of her outstanding debts."[108]

40.      An inexhaustive list of things courts consider in examining a debtor's overall conduct of its financial affairs includes the following:

- The balance on the alleged debtor's credit cards in proportion to the credit limit.[109]

- Whether the alleged debtor has had payments declined or "checks to creditors returned for insufficient funds."[110]

- An alleged debtor taking loans without documentation or definite repayment schedule.[111]

- The use of credit cards in another's name to pay the debtor's obligations.[112]

---

[106] *See, e.g.*, *In re Am. Cotton Suppliers Int'l, Inc.*, 2002 Bankr. LEXIS 1972 at *68-69 ("Some courts have applied a 50% standard, implying that an alleged debtor is not generally paying its debts as the become due when the unpaid debts total more than 50% of the debtor's debt."); *In re Kennedy*, 504 B.R. 815, 823 (Bankr. S.D. Miss. 2014) (noting that "courts in the Fifth Circuit have specifically held that defaulting on a single debt, which constitutes the majority of the alleged debtor's debt in the aggregate, amounts to a general default contemplated in § 303(h)").

[107] *In re Bates*, 545 B.R. at 190.

[108] *In re Moss*, 249 B.R. at 423.

[109] *In re Am. Cotton Suppliers Int'l, Inc.*, 2002 Bankr. LEXIS 1972 at *69.

[110] *Id.*

[111] *Id.* at *73; *Concrete Pumping Service, Inc. v. King Constr. Co.*, 943 F.2d 627, 630 (6th Cir. 1991) (noting that an "insider" loan to a company without documentation "strongly suggest[s] . . . 'fraud, artifice, or scam,' or possibly all three.").

[112] *In re Moss*, 249 B.R. at 423.

- The alleged debtor's "litigiousness and extensive experience in how to manipulate court proceedings to frustrate his creditors."[113]

- The alleged debtor's "credibility and candor as a witness."[114]

- A "lack of cooperation with [the petitioning creditor] in discovery."[115]

- An alleged debtor's attempt "to avoid bankruptcy by showing that he pays all other creditors and debts as they come due and arguing that this is a single-creditor involuntary petition filed to further a two-party collective action."[116]

**B.    All four factors support finding that ISC was not generally paying its debts as they came due as of the Petition Date.**

41.    The Court holds that the Petitioning Creditors have satisfied their burden to prove that ISC was not generally paying its debts as they came due as of the Petition Date. All four factors that courts consider in determining whether an alleged debtor was generally paying its debts as of the Petition Date weigh heavily in favor of finding that the Alleged Debtor was not. Accordingly, the Court has entered an order for relief.[117]

### 1.    The number, amount, and materiality of unpaid debts show that ISC was not paying its debts as they came due.

42.    The evidence was compelling to the Court that ISC was way behind with a vast majority of its trade creditors—not just as of the Petition Date but for many months pre-petition. The number, amount, and materiality of ISC's untimely debts owing as of the Petition Date all weigh in favor of a finding that ISC was not generally paying its debts as they came due. Specifically, the credible evidence showed more than 90% of ISC's trade debt was over 90 days past due as of the Petition Date.[118] Much of that trade debt was far-more past-due than 90 days,

---

[113] *In re Agrawal*, 562 B.R. at 517.
[114] *Id.*
[115] *In re Mikkelson*, 499 B.R. at 695.
[116] *Id.*
[117] ECF No. 170.
[118] Ex. ATI-1, at ISC_001878.

and it appears that ISC was always past due with more than 50% of its trade debt since January 1, 2020.[119]

43.     While the Alleged Debtor was apparently paying *de minimis* debts on time for the most part (such as its rent and utilities) as of the Petition Date, such payments are insufficient to alter the conclusion that ISC was not generally paying its debts as they came due, especially since the evidence suggested that Mr. Green's credit card were often used for such debts.[120]

> **2.     ISC's overall conduct of its financial affairs also weighs heavily in favor of finding that ISC was not generally paying its debts as they came due.**

44.     ISC's overall conduct of its financial affairs in the 18 months leading up to the bankruptcy filing was poor. This factor also weighs heavily in favor of a finding that ISC was not paying its debts as they came due as of the Petition Date.

45.     It appears that ISC is a company in which the principals have managed to keep their fingers holding the dam, but the dam is about to break. ISC's workforce has gone down from 28 employees to 11 in recent months. ISC readily admitted that it had large, deferred salary owing to employees from time to time and had trouble making payroll (other than perhaps with the help of a $30,000.00 loan from its CEO Mr. Buschhorn, who apparently both loans money to the company from time to time and takes large amounts of money from the company).[121] ISC appears to have been in dire financial straits for quite a while, losing money and borrowing from employees to pay basic expenses.

46.     Additionally, ISC was involved in numerous lawsuits prepetition as a defendant against creditors seeking to collect on their long-overdue debts.[122] ISC uses the personal credit

---

[119] Ex. ATI-1.
[120] Ex. ATI-4.
[121] Ex. ATI-10.
[122] Ex. ATI-17.

cards of its Vice President Galen Green for funding for the business (at very high interest rates).[123] Apparently, at least $200,000.00 of credit has been provided by Mr. Green to the company since he started with the company in 2018.[124]

47.    Several of the company's officers, including Mr. Buschhorn, Mr. Green, and the company's former CFO Kevin Flick,[125] have provided ISC with undocumented loans to cover payroll and other ordinary business expenses over the years. Only Mr. Buschhorn has been paid back on such loans.[126] There appear to be accounting irregularities, and Mr. Green, who does not have an accounting degree, keeps the books from his remote office in College Station, Texas. The company's former CFO did not have direct access to the firm's accounting software or the general ledger, over which Mr. Green exercises sole control, making adjustments when instructed to do so by Mr. Buschhorn. The company's books have never been audited.

48.    The evidence also showed several things amiss with the company, including, among other things, the following: (i) a CEO and wife (with the apparent figurehead titles of Chairman of the Board and President) taking eye-popping salaries given the size and nascent stage of the business; (ii) large personal expenses being paid by the company; and (iii) what appear to be questionable, lavish trips.

49.    Finally, the Alleged Debtor's apparent transfer of more than $1 million of funds to a company called The Spotlight App, LLC, whose manager is the 69-year-old father-in-law of Mr. Buschhorn, raises serious questions about ISC's overall conduct of its financial affairs. ISC

---

[123] Ex. ATI-4.
[124] Ex. ATI-3; Ex. ATI-19.
[125] Mr. Flick apparently deleted all his emails when he resigned from the company in December 2021.
[126] Exs. ATI-2; ATI-10; ATI-19; ATI-20.

produced no documents concerning this transaction, despite arguing that its post-petition conduct was relevant to the Court's analysis.[127]

### C. ISC's excuses for not paying its debts are unavailing.

#### 1. ISC's later settlements with creditors do not alter the original payment due dates.

50.     ISC apparently negotiated payment plans with some creditors long after it failed to timely satisfy its payment obligations to them. ISC contends that these post-petition agreements to make payments that are avoidable under Bankruptcy Code § 549 somehow nullify the original terms and conditions under which ISC incurred the obligations that are the subject of the repayment agreements.[128] ISC argues that these agreements "made the debts not due" when they came due and, therefore, the Court should not find that ISC was generally not paying its debts as they came due. ISC did not provide the Court with any case-law support for this argument in its trial brief or at the Hearing.

51.     The law is clear that "a party's subsequent actions do not change the terms of an otherwise valid contract."[129] Once a valid contract is duly executed, its terms are binding.[130] ISC's argument makes little sense, and nothing in the Bankruptcy Code, case law, or ISC's own documents supports ISC's assertion that acceptance of late payments by creditors many months— or, in some instances, years—after the debts originally came due somehow altered the agreed-upon due dates for ISC's payment obligations. The Court concludes that the operative date for determining whether a payment was timely or late is the date on which the parties agreed payment

---

[127] For example, ISC pointed to its post-petition payments to creditors on account of pre-petition debts as evidence that it pays its debts.

[128] ECF No. 129.

[129] *Bachner v. People ex rel. Ill. Student Assistance Comm'n (In re Bachner)*, 165 B.R. 875, 879 (Bankr. N.D. Ill. 1994).

[130] *See Borys v. Rudd*, 207 Ill. App. 3d 610, 566 N.E.2d 310, 314-15 ("Only a material breach of a contract provisions will justify nonperformance by the other party.").

would be due at the time they agreed on the sale. This straightforward proposition comports with both the law and common sense.

### 2. ISC was not excused from its payment obligations.

52. ISC's argument that "general force majeure considerations" nullified its pre-petition payment obligations is equally unavailing. There appears to be no authority in the case law for ISC's position that the pandemic generally operated to suspend ISC's contractual payment obligations to its trade creditors. ISC cited no *force majeure* provisions in any agreement with its creditors that would have excused ISC's performance. Nor has ISC provided the Court with any cases holding that "general *force majeure* considerations" made ISC's debts "not due" under the terms that ISC had previously agreed to. To the contrary, what case authority exists on the topic is uniformly contrary to ISC's position. ISC's agreements with its creditors contained no "force majeure" clauses that would alter the dates on which ISC's payment obligations came due.[131] The dates on which ISC's payment obligations arose were governed by the terms and conditions of sale that the respective parties bargained for at the time they decided to do business with each other. None of those terms and conditions excused ISC's obligation to pay for the goods it received simply because ISC claimed an inability to pay resulting from external circumstances for which ISC had failed to adequately prepare.

53. Nor do the common-law contract doctrines of impossibility or frustration of purpose support ISC's contention that the COVID-19 pandemic "made the debts not due."[132] Concerning the "impossibility" defense, "[w]here impossibility of performance is *caused only by*

---

[131] A few of ISC's purchase agreements with creditors were governed by terms and conditions that did contain force majeure clauses, but in each instance, those clauses protected the *seller* in the event of a specifically delineated *force majeure* event, and in no instance did any *force majeure* contractual provision excuse ISC from its payment obligations with respect to delivered goods or services. *E.g.*, Exs. ATI-12-2 & ATI-12-23.

[132] ECF No. 129.

*financial difficulty or economic hardship*, performance is not excused."[133] Case law specific to the COVID-19 pandemic confirms this well-established legal principle.[134]

54.     Frustration of purpose applies only "when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract."[135] "[T]o invoke the doctrine of frustration of purpose, the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense."[136] Like the doctrine of impossibility, courts have found that the COVID-19 pandemic does not excuse a party from contractual obligations under a theory of frustration of purpose. For example, in *Abasic*, a business owner claimed that the government's response to the COVID-19 pandemic made business economically infeasible.[137] The court flatly rejected that argument, holding that "[t]he disruption caused by the COVID-19 pandemic, however, is not sufficient to totally frustrate the purpose of the [contract]. Abasic can still attempt to operate a retail establishment on Fifth Avenue, as many businesses continue to do, even if it is unprofitable."[138]

---

[133] *Sanluis v. Evonis, Inc.*, No. 18 CV 05478 (ENV)(RML), 2021 U.S. Dist. LEXIS 164290, at *5 (E.D.N.Y. 2021) (emphasis added) (citations omitted). *See also Ebert v. Holiday Inn*, 628 F. App'x 21, 23 (2d Cir. 2015) ("Economic hardship, *even to the extent of bankruptcy or insolvency*, does not excuse performance." (emphasis added)); *175 Med. Vision Props., LLC v. Adubor*, 155 N.Y.S.3d 307 (Sup. Ct.) (citing *407 E. 61st Garage, Inc. v. Savoy Fifth Ave. Corp.*, 23 N.Y.2d 275, 281 (1968)).

[134] *See, e.g., A/R Retail LLC*, 149 N.Y.S.3d at 826-27 (listing cases); *Gap Inc. v. Ponte Gadea N.Y. LLC*, No. 20 CV 4541, 2021 U.S. Dist. LEXIS 42964, 2021 WL 861121, at *10 (S.D.N.Y. Mar. 8, 2021) (listing cases); *Clark v. Stanley Furniture Co., LLC*, Civil Action No. 4:20-cv-00063, 2021 U.S. Dist. LEXIS 198260, at *14 (W.D. Va. 2021) (listing cases); *Svanaco, Inc. v. Brand*, No. 15-cv-11639, 2020 U.S. Dist. LEXIS 256301, at *18 (N.D. Ill. 2020) (rejecting argument that executive orders signed by Connecticut's governor related to COVID-19 made it financially infeasible for a party to make the payments it had contractually agreed to make).

[135] *A/R Retail LLC v. Hugo Boss Retail, Inc.*, 149 N.Y.S.3d 808, 821 (1st Dep't 2021) (quoting Restatement (Second) of Contracts § 265, Comment a).

[136] *Id.* (citation omitted).

[137] *605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, No. 21cv811 (DLC), 2022 U.S. Dist. LEXIS 41123, at *11 (S.D.N.Y. 2022).

[138] *Id.* (noting that New York courts have "overwhelmingly held that the COVID-19 pandemic does not give rise to a frustration-of-purpose defense to a commercial lease"). *See A/R Retail LLC*, 149 N.Y.S. 3d at 823 (listing cases).

55. It appears that no bankruptcy court anywhere has ever held that "general *force majeure* considerations" or the doctrines of impossibility or frustration of purpose made an alleged debtor's debts "not due" at the time for payment that the contracting parties had agreed upon when they entered the sale transaction. This Court declines ISC's invitation to be the first to do so. The Court concludes that ISC's payments to creditors were due when the terms of their agreements with those creditors provided they were due. Those due dates were not retroactively altered or suspended merely because external events may have negatively impacted ISC's ability to make timely payments as they came due.

### 3. Abacus was not to blame for ISC's own failure to pay its debts as they came due.

56. Finally, the Court concludes that ISC's attempt to shift the blame to Abacus as a scapegoat for ISC's own financial mismanagement is misplaced. Rather than accept responsibility for its own financial decisions that resulted in so many of its creditors not being paid in a timely manner, ISC seeks to shift the blame for its financial problems to Abacus.[139] But the evidence shows that ISC had entered dire financial straits before ever buying anything from Abacus.[140] ISC was undercapitalized, borrowing from its own employees to pay basic business expenses, carrying an unmanageable debt load, losing money, and falling behind on its payment obligations throughout its nascent corporate life. ISC has contended throughout the pendency of this case that Abacus's alleged failure to timely deliver product in early 2020 prevented ISC from obtaining certification from a facility that shut down in mid-March 2020 due to COVID-19, and that without this certification ISC was unable to sell the products Abacus had provided, contributing to ISC's financial problems. But the testimony from Mr. Buschhorn at the hearing undermined this

---

[139] *See, e.g.*, ISC's Responses and Objections to Abacus's Interrogatories, Ex. ATI-17.
[140] Exs. ATI-1; ATI-2; ATI-3; ATI-4; ATI-5; ATI-6; ATI-7.

contention, as he acknowledged that the company obtained the required certification in February 2021 and, despite this, the products were still unsold and in ISC's inventory as of the date of the Hearing, more than a year after obtaining the certification ISC claimed was the primary obstacle to selling the inventory.

## III.   CONCLUSION

57.   For the foregoing reasons, the Court finds and concludes that ISC was not generally paying its debts as they came due as of the Petition Date. Accordingly, the Court has entered the order for relief in accordance with Bankruptcy Code § 303(h).

*[Remainder of page intentionally left blank]*

Prepared by:

Judith W. Ross
State Bar No. 21010670
Frances A. Smith
State Bar No. 24033084
Eric Soderlund
State Bar No. 24037525
**Ross & Smith, PC**
700 N. Pearl Street, Suite 1610
Dallas, Texas 75201
Telephone: 214-377-7879
Facsimile: 214-377-9409
Email: judith.ross@judithwross.com
       frances.smith@judithwross.com
       eric.soderlund@judithwross.com

**Counsel for Abacus Technologies, Inc.**